IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Manuel A. Marin,                        )
                                        )    C/A No. 2:22-0351-DCC
                  Petitioner,           )
                                        )
        vs.                             )
                                        )    **ORDER AND OPINION**
Warden of Lieber Correctional          )
Institution,                            )
                                        )
                  Respondent.           )
_____   )

Petitioner Manuel A. Marin is an inmate in custody of the South Carolina Department of Corrections. He currently is housed at Lieber Correctional Institution in Ridgeville, South Carolina. On February 4, 2022, Petitioner, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the court on motion for summary judgment filed by Respondent Warden of Lieber Correctional Institution.

## I. FACTS AND PROCEDURAL HISTORY

The victim, Nelson Tabares, was living in Greer, South Carolina, with his wife and child. Tabares, who was born in Colombia, created a website named "Crazylatino.com" for the local Spanish-speaking community. Transcript of Trial, ECF No. 23-1 at 67. Tabares promoted and attended events catering to the Spanish community in order to help foster a sense of fellowship among neighborhoods. On July 20, 2008, Tabares attended a Colombian Independence Festival where he spent the day taking photos to post on his website. Later that evening, Tabares attended an after-party at Bongos Nightclub on East North Street in Greenville, South Carolina.

When Tabares arrived at Bongos Nightclub, he told the owner, Larry Rodriquez, he was not feeling well. Rodriquez seated Tabares in the kitchen, brought him some water, and tried without

success to call Tabares's wife. Rodriquez told his security people to keep an eye on Tabares, and returned to his duties running the club. He did not see Tabares again. *Id.* at 78-81.

Tabares returned to the afterparty and became intoxicated. The club halted Tabares's access to alcohol because Tabares was stumbling and could not stand up without support. *Id.* at 84. Tabares was escorted back to the kitchen to sober up but kept wanting to go back into the nightclub and talk. Around 10:30 p.m., Tabares called his wife and indicated he would be home shortly. *Id.* at 73. However, several hours later a bouncer reported to Rodriquez that Tabares was in no condition to drive. Rodriquez told the bouncer to find Tabares a ride home. Petitioner, who also was attending the after-party with a friend, Alfredo Jimenez, offered to take Tabares home. Petitioner stated he knew where Tabares resided. *Id.* at 87. Around a 3:00 a.m. closing time on July 21, 2008, a bouncer from Bongos placed Tabares in the back seat of Petitioner's red Durango. Jimenez was sitting in the front passenger seat. *Id.* at 89-90.

Later that morning, witnesses heard two Hispanic males arguing in the street in downtown Spartanburg, South Carolina. One was wearing a black shirt and the other a white shirt. They were both distraught and one was crying. The men appeared to be tussling over a weapon. The man in the black shirt pulled what appeared to be a handgun from the other man's pocket. They continued arguing and yelling at each other across the street. The man in the black shirt threw the handgun against a curb. Officer Jeffery Powell of the Spartanburg City Police Department was dispatched to the scene around 4:04 a.m. *Id.* at 94-110, 114-15. As Powell exited his vehicle, the man in the black shirt kept saying hysterically, "Dude shot him, dude shot him," as he pointed toward the individual wearing the white shirt. The man in the black shirt told Powell he had taken the gun from the individual in the white shirt and thrown it in the street. The man in the black shirt pointed to

2

where he had thrown the weapon. *Id.* at 117. Powell secured the weapon and commenced interviewing the two males and the witnesses. Powell asked the individual in the black shirt where the shooting occurred, and the man replied the incident took place at the Wal-Mart in Greer.[1] The man also reported the victim had been shot while trying to wreck the vehicle by grabbing the steering wheel. *Id.* at 122.[2]

George Brown of the Spartanburg City Police Department was the second officer to arrive at the scene. He observed a male subject wearing a white shirt covered in blood and another male in a black shirt crying and repeating, "dude shot him, dude shot him" while pointing at the individual wearing a white shirt. The individual in the black shirt recited to Brown he and the other man "had left a club over in Greenville and that they were supposed to be taking the victim – supposed to be taking him home. And they had gone past his road and he got very upset and was trying to, to get them to stop the car, and the driver wouldn't stop. He said he just wouldn't stop. And [the individual] said that was when [the victim] started fighting with the driver of the car." *Id.* at 125. Tabares's body was located in a Dodge Durango parked nearby. *Id.* at 126, 168. Tabares's identification card was found on the left-side rear floorboard. The vehicle was determined to belong to Petitioner, the man in the white shirt. The individual in the black shirt was identified as Jimenez. Petitioner's vehicle registration, South Carolina's driver's license, and a receipt from the purchase by Petitioner of a Ruger P95 9mm handgun were collected from the vehicle. *Id.* at 181. Petitioner's

---

[1]Part of Greer is located Spartanburg County and part in Greenville County. Law enforcement subsequently confirmed the incident took place on Highway 29 in Spartanburg County. This verification was important for purposes of jurisdiction. Petitioner disputed the location of the event.

[2]Jimenez could not be located and did not testify. It appears he may have returned to his home country. His comments were admitted through Powell as excited utterances under Fed. R. Evid. 803(2).

3

latent fingerprints were captured on the left-side rear door. *Id.* at 201. A laptop with GPS software in Petitioner's vehicle logged Tabares's address as having been entered into the device. In addition, a firearms trace tracked the Ruger handgun from the manufacturer to the North Pleasantburg Gun and Pawn in Greenville on April 21, 2000. The gun and pawn shop's records showed Petitioner legally purchased the Luger on June 2, 2000. *Id.* at 224.

Dr. John David Wren performed an autopsy on Tabares on July 21, 2008 in the Spartanburg Regional Medical Center. *Id.* at 229. He reported Tabares had sustained two gunshot wounds to the head, one of which was immediately fatal and the other potentially fatal. *Id.* at 230. Both wounds occurred to the back of the head and were determined to be contact wounds. *Id.* at 235-37. Tabares had been extremely intoxicated with a blood alcohol content of .323. *Id.* at 239. Testing established the presence of gunshot residue on the right palm, right back, and left palm of Tabares's hands. An analysis of Petitioner's gunshot residue test showed residue on the back of his left hand. *Id.* at 245-46. A test of Jimenez's hands revealed no residue. *Id.* at 247.

Petitioner was arrested on July 25, 2008. ECF No. 23-6 at 40. On August 21, 2008, Petitioner was indicted and charged with murder, in violation of S.C. Code Ann. §§ 16-3-10 and -20 (Count One); and possession of a firearm during the commission of a violent crime, in violation of S.C. Code Ann. § 16-23-490 (Count Two). ECF No. 23-6 at 39. Petitioner proceeded to trial before the Honorable J. Derham Cole and a jury on October 25-27, 2010. Petitioner was represented by trial counsel, Tanya R. Jones, Esquire. The case was prosecuted by Jennifer A.J. Jordan, Esquire, and Susan Borries Reese, Esquire on behalf of the State. On October 26, 2010, after the State rested its case, Petitioner informed the trial judge he wished to testify. *Id.* at 268. The trial judge queried Petitioner about his understanding of the risks and benefits of taking the stand. Petitioner indicated

4

he understood he had a right to remain silent and the jury would be instructed to not hold Petitioner's silence against him. Petitioner affirmed he had made his decision of his own free will and accord.

The trial judge next heard argument regarding a directed verdict. First, trial counsel argued Tabares had tried to take control of the Durango after Petitioner missed the turn to Tabares's residence. Trial counsel asserted there was no evidence Petitioner acted with malice and with a cold heart.[3] *Id.* at 273. In response, the State argued the fact there were two contact wounds to the back of Tabares's head was sufficient to show malice. Next, trial counsel moved to dismiss based on venue, noting there had been no testimony in terms of whether the incident took place in Greenville or Spartanburg Counties. The State argued venue was appropriate because an officer traveled to the site that had been indicated to him to be the actual site of the shooting and debris in the area was consistent with the events that allegedly had transpired. In addition, the State submitted Tabares's body's having been found in the Spartanburg city limits was adequate to establish venue. *Id.* at 274. The trial judge determined there was substantial circumstantial evidence establishing both the crime of murder and proper venue, so he denied Petitioner's motions.

Turning to jury charges, trial counsel requested the jury be instructed regarding the lesser included offense of voluntary manslaughter. Trial counsel noted the altercation between Petitioner and Tabares took place in the front seat of the Durango and would constitute sufficient provocation and not enough time to cool off.[4] The State did not object to this jury charge. Trial counsel also

---

[3] "'Murder' is the killing of any person with malice aforethought, either expressed or implied." S.C. Code Ann. § 16-3-10. "The statute does not create a new crime, but is merely declaratory of the common law, and in no way affects the ingredients which are necessary to constitute the crime at common law." *State v. Wilson*, 89 S.E. 301 (S.C. 1916).

[4] "'Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation.'" *State v. Sims*, 825 S.E.2d 731, 739 (S.C. Ct. App. 2019)(quoting *State*

5

argued in favor of including jury charges for involuntary manslaughter[5] and self-defense under South Carolina's stand-your-ground law, Protection of Persons and Property Act, S.C. Code §§ 16-11-410 to -450, specifically section 16-11-440.[6] The trial judge took the propriety of the latter two proposed charges under advisement.

Petitioner took the stand when trial resumed on October 27, 2010. Petitioner stated he had arrived at the Colombian festival around 12:30 p.m. or 1:00 p.m. where he had imbibed a couple of alcoholic drinks and eaten some food. Petitioner left the festival around 8:30 p.m. or 9:00 p.m. and arrived at Bongos around 12:30 or 1:00 a.m. on July 21, 2008. Jimenez was with him and they spent the evening sitting and talking. *Id.* at 293. At some point Petitioner went into the kitchen where he chatted with Rodriquez, the owner of the club. Tabares and a security guard were in the kitchen as well. *Id.* at 294. Petitioner testified that around 3:00 a.m. Rodriquez asked Petitioner if he could give Tabares a ride home. The security guard put Tabares in the back seat. Tabares was "pretty drunk." *Id.* at 295. Petitioner obtained Tabares's address and entered the address into GPS software in his laptop. Petitioner testified Jimenez, who also was intoxicated, was in charge of directing Petitioner to Tabares's residence. *Id.* at 296-97. Petitioner testified he and Jimenez were discussing Colombian current events when Tabares suddenly stated, "he has got to go" and grabbed Petitioner

---

*v. Sams*, 764 S.E.2d 511, 514 (S.C. 2014)).

[5] "Involuntary manslaughter" is (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Wharton*, 672 S.E.2d 786, 789 (S.C. 2009).

[6] "Presumption of reasonable fear of imminent peril when using deadly force against another unlawfully entering residence, occupied vehicle, or place of business." (extending Castle Doctrine to other places where the defendant has a right to be).

in a headlock. Petitioner exclaimed, "hey man, what the hell you doing" and slammed on the brakes. Tabares slumped back in his seat and Petitioner continued driving. *Id.* at 298-99.

Petitioner testified he was terrified and he decided to take Tabares to a public place where Petitioner could get some help. *Id.* at 300. According to Petitioner, all of a sudden Tabares jumped up, grabbed the steering wheel, and tried to run the car off the road. Petitioner testified he kept pushing Tabares back, but Tabares would lunge for the steering wheel and try to run the vehicle off the road again. *Id.* at 301-02. Finally, Petitioner opened the glove box, retrieved his weapon, and shot Tabares. Tabares fell on Petitioner's knee. Petitioner was "really scared" and "in shock" and kept driving in a straight line until he ended up in downtown Spartanburg. *Id.* at 303. Jimenez was talking loudly and was in shock. Petitioner testified, "I just kept saying why was he trying to kill us, why was he trying to kill me, why, why was he trying to run us off the road." *Id.* at 304. Petitioner acknowledged Jimenez took the weapon from him in Spartanburg. Then a gentleman pulled up and Jimenez asked him to call the police. Neither Petitioner nor Jimenez had a cell phone to call for help. *Id.* at 307.

On cross-examination, Petitioner testified in response to the solicitor's questions:

Q    At some point did you ever pass Mr. Tabares' road and then continue to drive very fast down 29?

A    I don't know.

Q    You don't know.

A    No, ma'am.

Q    Were you running red lights and driving erratically?

A    I can't recall.

7

Q       And did Mr. Tabares ask you to please slow down?

A       No, ma'am.

Q       And he never asked you to turn around.

A       No, ma'am.

Q       Did he ever ask you to stop, I need to get out, let me out?

A       No, ma'am.

Q       Now, you say you're driving down 29 and you're trying find a public place.

A       Yes, ma'am, well.

Q       Some place to stop and let him out.

        . . . .

A       [I] was just trying to keep the car off [*sic*] the road and trying to get him, keep him from, from killing us.

Q       So you reach over and you grab the gun out of the glove box, and it's in a pouch.

A       Yes, ma'am.

Q       All right. How do you get the gun out of the pouch?

A       I put it between my legs.

Q       You take one hand off the steering wheel to do that?

A       I did it with my right hand. I had my left hand on the steering wheel, and I got the gun with my right hand.

Q       So a guy is coming over the back of your seat to try to grab the steering wheel, and you decide at that moment to take one hand off the steering wheel and to take this gun out of its pouch.

A       I'm pushing him off, and then I reached over to the glove box.

8

Q    And this guy is attacking you, and you're taking your gun out of your pouch.

A    Yes, ma'am.

Q    It doesn't occur to you to stop the car.

A    No, ma'am.

Q    Once you got the gun out of the pouch what did you do with it?

A    I shot him.

Q    Did you pull the slide back?

A    No , ma'am.

Q    Why not?

A    It was, it was already, it was already loaded.

Q    And when did you load it?

A    I keep it loaded.

Q    So you keep it cocked like that in your glove compartment.

A    Not cocked, not cocked but loaded.

Q    With the slide pulled back already.  It's ready to fire.

A    Yes, ma'am.

Q    All right.  So it's in a pouch but it's ready to fire.

A    Yes, ma'am.

Q    Where did you shoot him?

A    In the back of the head.

Q    How many times?

A    Twice.

Q        After the first time was he –  what was he doing?

A        I – it was just boom, boom, I mean, and then he fell.  He fell, he fell down.

Q        So you shot him in the head. But he wasn't fighting you after you after you shot him in the head, was he?

A        No, ma'am.

Q        And you shot him again.

A        No.  It happened real fast – boom, boom.

Q        After the first shot was he still fighting you?

A        I mean, it, it just happened within seconds.

Q        And you shot him twice in the back of the head.

A        Yes, ma'am.

Q        At different angles .

A        I, I guess.

Q        How many times did you pull the trigger?

A        Twice .

         . . . .

Q        After you shot him and he's in your car and he's over the seat is he leaning on you?

A        I suppose, yes.  I, I was, I was in shock.  I mean, I –

Q        When you get out of the car do you agree with me that there is blood all over you?

A        Yes.

Q        Your pants are drenched, in blood.

A    Yes.

Q    It's all over your pants . It's all over your hands.

A    I suppose, yes.

Q    And you drive ten miles into the City of Spartanburg.

A    I don't know how far I drove.

Q    And he's laying there, and you don't get him help.  You don't stop anywhere.  There's a Wal-Mart on, on the way into, into Spartanburg.  You didn't stop.

. . . .

Q    You didn't stop and try to get him help.

A    I didn't see.  Everything was dark, everything was closed, and, and I just didn't see any –

Q    There's not a gas station; there's not a business.  There's nothing open in the ten miles that you drove from 29 to downtown Spartanburg.

A    I didn't see any.

Q    And you didn't choose to stop that car in the road.  What happened is Mr. Jimenez jumped out of that car, isn't that true?

A    No.  He got out of the car.

Q    He got out of the car, but it wasn't stopped when he got out of the car.

A    I, I don't know, I don't know.

Q    He got out of the car, and you ran around the car with the gun in your hand, and you told him to get back in the car, didn't you?

A    No, ma'am.

Q    He was afraid.  That's why he got out of the car, right?

A    He was in shock.  So was I.

11

Q    And when you came around that car to talk to him you had the gun in your hand.

A    I didn't realize, but yes.

Q    And he took it from you.

A    Yes.  He grabbed the gun.

ECF Nos. 23-1, 291-325; 23-2, 1.

On redirect, Petitioner explained he kept a loaded gun in the car because he lived in a dangerous neighborhood.  He further stated he was a manager of an establishment where he was required to close the store at night, sometimes alone, and make nightly deposits at the bank. Accordingly, he kept the weapon with him at all times.  ECF No. 23-2, 2.

Trial counsel thereafter renewed her motions for a directed verdict based upon the insufficiency of the evidence.  She argued there was no indication Petitioner acted with malice, but in self-defense.  Trial counsel renewed her motion for directed verdict regarding venue.  In addition, trial counsel renewed her request that the jury be instructed on (1) immunity from prosecution under S.C. Code Ann. § 16-11-450; (2) voluntary manslaughter; (3) self-defense; and (4) involuntary manslaughter.  The trial judge rejected the proposed involuntary manslaughter charge and the charge as to section 16-11-450, stating immunity was not a jury question.  The solicitor did not object to the inclusion of the remaining instructions.  ECF No. 23-2, 3-13.

Trial counsel presented her closing argument to the jury, advocating for Petitioner's position he acted in self defense and that, under South Carolina law, "if you are attacked in your place, your home or your vehicle to meet force with force.  You are not required to retreat because it's your vehicle, it's your home."  ECF No. 23-2 at 14-25.  The solicitor on behalf of the State recited the

12

evidence and testimony and continued:

> Now, the state has to prove to you murder. What are the elements of murder? Murder is an intentional killing of another. There's no doubt this was intentional. With malice aforethought.
>
> And what is malice? Malice is the doing of a wrongful act intentionally without just cause or excuse. It signifies a general malignant recklessness of the lives and safety of others or a condition of the mind that shows a heart, regardless of social duty, and fatally bent on mischief.
>
> Ladies and gentlemen, I submit this is malice. Two shots, not one, two shots to the back of the head. One of them tight contact, barrel up against the head.
>
> . . . .
>
> Would a reasonable person shoot someone twice in the back of the head? Everything he said is true?
>
> You've got a man with a .33 blood alcohol who can't stand, can't walk, who is ready to pass out. You have another one in the passenger seat. He grabs the steering wheel and could have put on the brake, taken his foot off the gas and stopped. He says no, I was so fearful that I had to take my hands off the wheel, get a gun, pull the slide back and shoot him twice in the back of the head rather than stopping the car.
>
> . . . .
>
> I would submit that we have proven that this is not self-defense beyond a reasonable doubt. I would submit that we've proven this is not reasonably necessary behavior beyond a reasonable doubt.

*Id.* at 25-51.

> The trial judge charged the jury on self defense as follows:
>
> In this case the defendant has . . . raised what is known in the law as the defense of self-defense. The law recognizes the right of every person to protect himself or herself or a friend, relative[,] or another from death or from sustaining serious bodily harm. To do this a person may use such force as is reasonably necessary even to the point of taking a human life where such is reasonable.
>
> The right of self-defense is founded upon necessity, either actual or reasonably apparent necessity. And it is a complete defense to a charge of an unlawful homicide

13

should you find that it exists based upon your evaluation of the evidence produced during the trial of this case. The existence of self-defense entitles a person charged with the commission of an unlawful homicide to a verdict of not guilty.

And although the defendant has raised the defense of self-defense, the burden of proof is not on defense, the burden of proof is not on the defendant to prove the existence of self-defense. As I have already told you, the burden is always upon the State to prove the defendant's commission of the crime alleged against him beyond a reasonable doubt. And this would therefore necessarily require that the State prove beyond a reasonable doubt the absence of self-defense.

But in order for you to consider the defense of self-defense you obviously must know what the elements are. And there are four basic elements that are required before self-defense may be established.

First, it must be shown that the defendant was without fault in bringing on the immediate difficulty which gave rise to the necessity of using deadly force which resulted in the taking of human life.

One cannot provoke, initiate[,] or otherwise through his own fault bring about a difficulty and then claim the right of self-defense in the use of deadly force against an attack which was caused by that provocation.

Secondly, it must be shown that at the time the fatal act was committed the defendant actually believed that he was in imminent danger of losing his life or sustaining serious bodily injury, or some other person was, or that the defendant actually was in such imminent danger. And the term imminent danger means an immediate or present danger and not a past or future danger.

And, thirdly, if the defense is based upon a belief of imminent danger, then it must be shown that the belief was reasonable, that is a reasonably prudent person of ordinary firmness and courage would have entertained the same belief.

If the defendant or the other person being defended actually was in imminent danger, then it must be shown that the circumstances were such as would warrant a person of ordinary prudence and courage to inflict the fatal injury in order to save himself or some other person from death or serious bodily injury.

In other words, it must be shown that a reasonably prudent person of ordinary firmness and courage if acting under the same or similar circumstances would have reached the same conclusion and entertained the same belief.

Deadly force is only appropriate when necessary and may only be exercised where

14

the defendant entertains a reasonable belief that he or some other is about to sustain loss of life or suffer serious bodily harm.

The law of self-defense encompasses preventative action taken to protect one's own life without another if such action is taken in anticipation of imminent danger of losing one's life or sustaining serious bodily injury.

A defendant has a right to act upon appearances. He may be mistaken. The law does not hold someone to a refined assessment of the danger as might be accomplished having an adequate time to reflect, provided however that the defendant has acted as a person of ordinary reason, firmness and courage would have acted or should have acted in meeting the appearance of the danger.

In other words, one does not have to wait until his or her assailant gets the advantage, for one always has the right under the law of self-preservation to prevent another from getting an advantage.

Again, there is however a requirement of objectivity. Any such belief must be reasonable, that is a reasonable and prudent person if acting under the same or similar circumstances would have so believed or would have also been warranted in acting as the defendant did.

And, fourthly, it must be shown that the defendant had no other means of avoiding the danger of losing his life or sustaining the infliction of serious bodily injury other than to act as he did under the particular circumstances as existed, because, as I have stated, self defense is founded upon necessity.

*Id.* at 68-71.

After the jurors were charged, but before they were authorized to begin their deliberations, trial counsel took exception to the trial judge's refusal to charge the jury as to immunity from prosecution set out in section 16-11-450. ECF No. 23-2, 79. Trial counsel also noted some language from Petitioner's proposed jury charge regarding self-defense had been left out. Trial counsel requested a charge to the effect that, if the defendant is justified in defending himself or others in firing the first shot, then the defendant can continue shooting until it is apparent the danger of death or serious bodily injury has completely ended. *Id.* at 80 (citing *State v. Rye*, 651 S.E.2d 321 (S.C.

2007)).  The trial judge questioned whether he was required to give such a charge under South

Carolina law.  There being no precedent so requiring, the trial judge denied the request.

A couple of hours after deliberations began, the jury sent a note to the trial judge asking the

judge to redefine or give them an additional instruction defining malice and voluntary manslaughter.

*Id.* at 84.  The trial judge recharged the jury as follows:

THE COURT:    All right.  Malice as an essential element of the crime of murder is
a state of mind connoting an ill will and having an intent to do harm.

It is a technical term importing wickedness and excluding just cause or legal excuse.
It is something which springs from depravity, from a heart devoid of social duty and
fatally bent on  mischief. It is a state of mind indicating an extreme disregard for or
an extreme indifference to human life.

Malice may likewise [be] defined as a state of mind which indicates a formed
purpose and design to do a wrongful act under circumstances that exclude any legal
right to do it.

And malice may be either expressed or implied. The terms expressed or implied do
not mean different types of malice but simply the manner in which malice may be
shown to have existed, that is to say by proof, by direct evidence or proof by
circumstantial evidence from which malice might be reasonably inferred. . . .

Malice may be expressed as where there is an expressed threat to kill or a lying in
wait or where the circumstances show directly that the intent to kill was entertained
by the killer.

Malice may be inferred, though no expressed intent to kill is proven by direct
evidence, where the facts and circumstances which have been proven by the evidence
in the case satisfy you beyond a reasonable doubt that malice was present in the mind
of the defendant at the time any killing took place.

And the existence of malice may be inferred from acts, declarations and conduct of
the  defendant, as well as any other circumstances shown to have existed at the time
of the event.

Malice as an essential element of the crime of murder does not necessarily require
proof of an actual or specific intent to take human life, but rather it means a state of
mind accompanying conduct signifying a general malignant recklessness and an

16

extreme disregard for or an extreme indifference to human life.

And malice must be malice aforethought, the law not requiring that malice exist for any appreciable length of time before the commission of an act causing a fatal result. Indeed, it might be conceived at the very moment that the fatal act is committed.

It is sufficient in the law so long as the state does prove beyond a reasonable doubt both the existence of malice and the commission of an act or acts by the defendant which proximately caused the fatal result.

Manslaughter is defined as an unlawful killing of a human without the element of malice either expressed or implied being present. While the element of malice must be proven in order for the defendant to be found guilty of the crime of murder, malice is not an essential element of the offense of voluntary manslaughter.

Voluntary manslaughter is defined in the law as the unlawful killing of another human being which is committed in sudden heat of passion provoked by a sufficient legal provocation.

The law recognizes that sudden heat of passion, arising out of exasperation, rage, anger, sudden resentment, fear or terror may for the time being affect the self control of an individual temporarily disturbing the ability to properly reason creating an uncontrollable impulse to do violence and therefore reduces the crime from that of murder to that of voluntary manslaughter provided that the killing was committed in sudden heat of passion and that sudden heat of passion arose from a sufficient legal provocation.

The sudden heat of passion aroused by a sufficient legal provocation which may reduce a homicide from that of murder to that of voluntary manslaughter need not dethrone reason entirely or shut out knowledge and volition, but it must be such heat of passion provoked by such facts circumstances as would naturally disturb the ability of an ordinary reasonable and prudent person to properly reason rendering his mind incapable of cool reflection and producing what according to human experience may be described as an uncontrollable impulse to do violence.

ECF No. 23-2, 84-88.

Later, while the jury was deliberating, trial counsel renewed her request for a jury instruction to the effect that if a defendant fires a weapon once, he is allowed to continue shooting until the threat is removed.  Trial counsel cited to *Douglas v. State*, 504 S.E.2d 307 (S.C. 1998), and *State v.*

*Campbell*, 96 S.E. 543, 544 (S.C. 1918), in support of her request. The trial judge reviewed the cases and determined the law had been properly communicated to the jury and no further instructions were needed. ECF No. 23-2 at 89-91.

The jury returned a verdict of guilty as to both counts. *Id.* at 92. Afterwards, the trial judge heard from the victim's wife, Laura Tabares, and his sister, Diane Tabares. Diane Tabares testified as to Tabares's community involvement, as well as the fact he was a cancer survivor and that Tabares was murdered the day her son, Tabares's nephew, was due to be born. *Id.* at 95-97. The trial judge also heard from defense counsel and one of Petitioner's daughters. Petitioner stated his regrets regarding the incident. *Id.* at 97-100. The trial judge sentenced Petitioner to be confined with the South Carolina Department of Corrections for the period of his natural life for the charge of murder. In accordance with S.C. Code Ann. § 16-23-489(A),[7] the trial judge imposed no sentence for the charge of possession of a firearm during the commission of a violent crime. ECF No. 23-2 at 101; ECF No. 23-6 at 41.

Petitioner timely filed a direct appeal to the South Carolina Court of Appeals with the assistance of Robert M. Dudek of the South Carolina Commission on Indigent Defense. ECF No. 23-2 at 105-22. Petitioner asserted the following grounds for review:

> Whether the court erred by refusing to instruct the jury on self-defense that a defendant acting in self-defense had the right to continue shooting until it was apparent that the danger of death or serious bodily injury had ended since this was a widely accepted correct instruction on the law, and appellant had a right to have the instruction crafted to the facts of the case?

---

[7] Section 16-23-489A provides a person in possession of a firearm during commission of a violent crime who is convicted of committing a violent crime as defined in section 16-1-60 must be imprisoned five years in addition to the punishment provided for the principal crime, except where the death penalty or a life sentence without parole is imposed.

Whether the court erred by refusing to charge South Carolina Code § 16-11-450(a) that a person protected by the Castle Doctrine who was acting lawfully was immune from criminal or civil prosecution, since the judge erred by refusing to give a full jury instruction on the Castle Doctrine where it was raised by the evidence in this case?

*Id.* at 108.

The State was represented on appeal by Donald J. Zelenka, Esquire, Assistant Deputy Attorney General; and Russell D. Ghent, Esquire, Assistant Solicitor, Seventh Judicial Circuit. *Id.* at 123-63. The South Carolina Court of Appeals expressed its opinion the requested charge was not a correct statement of law. Citing *State v. Davis*, 317 S.E.2d 452, 453 (S.C. 1984), the court of appeals noted, "if the State has not proven the absence of any other element, a person may use deadly force in firing the first shot when he reasonably believes it is necessary to prevent death or serious bodily injury. Under the language requested by [Petitioner], however, a defendant could continue to shoot even if the first shot changed the circumstances to make the use of deadly force no longer reasonable, so long as the initial danger has not '*completely* ended.'" ECF No. 23-2 at 167. The court of appeals recognized similar language was used in *Douglas v. State*, 504 S.E.2d 307 (S.C. 1978), and *State v. Hendrix*, 244 S.E.2d 503 (S.C. 1978). According to the court of appeals, it is permissible for a trial judge to instruct a jury a defendant may continue to shoot as long as necessary, but the cases cited did not address the precise issue raised in this case: whether the trial judge is required to charge this point to the jury. ECF No. 23-2 at 169.

The court of appeals determined the jury charge, considered as a whole, explained the general principle that any particular act of deadly force done in self-defense is justified if the act was reasonably necessary to prevent death or serious bodily injury under the circumstances as they existed at the time of the act. *Id.* at 169. The court of appeals determined it was the task of trial

19

counsel to argue the second shot was reasonably necessary under the circumstances. Thus, the court of appeals concluded the trial judge's refusal to charge the "continuing to shoot" language requested by Petitioner was not error.

Regarding immunity under section 16-11-450(A), the court of appeals determined the trial judge correctly refused to charge this section because the section does not contain any substantive provisions of law. The court of appeals concluded the provision allows a circuit court to grant immunity from prosecution before a trial begins if the court finds the defendant acted lawfully in self-defense. ECF No. 23-2, 171 (citing *State v. Duncan*, 709 S.E.2d 662, 665 (S.C. 2011)).

The court of appeals affirmed Petitioner's conviction for murder. ECF No. 23-2, 172; *see State v. Marin*, 745 S.E.2d 148 (S.C. Ct. App. 2012). Petitioner, through appellate counsel, petitioned for rehearing, *id.* at 173-77, which was denied, *id.* at 178 (the Honorable James E. Lockemy indicating he would have granted rehearing). Petitioner then filed a petition for writ of certiorari to the South Carolina Supreme Court, asserting the following question:

> Whether petitioner was entitled to a jury charge on a correct statement of law fitting the facts of this self-defense case: that one acting in self-defense has the right to continue shooting until it was apparent that the danger of death or serious bodily injury had ended?

*Id.* at 183.

The supreme court granted the petition by order dated October 23, 2014. ECF No. 23-3 at 43. On March 23, 2016, the supreme court issued its opinion affirming as modified. *Id.* at 89-101; *see State v. Marin*, 783 S.E.2d 808 (S.C. 2016). The supreme court found the court of appeals erred in expressing its concern the charge Petitioner requested was an incorrect statement of the law. The supreme court noted it had previously held a person who is justified in firing the first shot, is justified

20

in continuing to shoot until it is apparent the danger to his life has ceased. *Id.* at 95 (citing *State v. Hendrix*, 244 S.E.2d 503, 507 (S.C. 1978)). The supreme court found meritless Petitioner's argument the trial judge "committed reversible error by failing to charge the jury that one who is acting in self-defense and has the right to fire a first shot has the right to continue shooting until it is apparent the danger of death or serious bodily injury has ended." *Id.* at 94. The supreme court determined this common law rule sufficiently was encompassed in the jury charge provided by the trial judge. *Id.* The supreme court agreed that, although the "continuing to shoot" charge might have been appropriate, the trial judge's refusal to include the charge did not mandate reversal. The supreme court found "the essence of the charge was encompassed in the jury instructions, particularly the instruction that 'a person may use such force as is reasonably necessary even to the point of taking human life where such is reasonable.'" *Id.* at 102. The supreme court further observed the trial judge gave a thorough and comprehensive self-defense charge, "well beyond the general *State v. Davis* [317 S.E. 2d 452 (S.C. 1984)] elements." *Id.* at 95.[8, 9] Remittitur was issued on April 8, 2016. *Id.* at 102.

Petitioner next filed an application for post-conviction relief (PCR) on July 28, 2016. *Id.* at 103-34. Petitioner filed amended PCR applications on September 5, 2017, *id.* at 144-52; October 4, 2017, *id.* at 135-43; November 17, 2017, *id.* at 156-58; November 20, 2017, *id.* at 154-55;

---

[8]The supreme court recited: "The four-part self-defense instruction recommended by this Court in *Davis* was (1) the defendant was without fault in bringing about the danger; (2) the defendant believed he was, or the defendant actually was, in imminent danger of death or serious bodily harm; (3) the defendant's belief or action was reasonable; and (4) the defendant had no other probable means of avoiding the danger, except that a defendant on his own premises has no duty to retreat."

[9]The Honorable Costa M. Pleicones dissented, arguing the charge given did not encompass the charge requested, and the trial judge's refusal to give the charge constituted reversible error.

November 20, 2017, *id.* at 159, and December 4, 2017, *id.* at 153. Petitioner raised the following

grounds for relief:

    1 .    Ineffective Assistance of Trial Counsel

a.    "Failing to object to witness Diane Tabares' statement, 'He was a cancer survivor.'"

b.    "Failing to object to witness Diane Tabares' statement that she was pregnant and was due to deliver on the day of the incident."

c.    "Failing to recall the witness Larry Rodriguez to the stand and impeach the witness for lying on the stand."

d.    Failing to object to and allowing the autopsy photographs to be entered into evidence.

e.    Failing to have an evidentiary hearing to have defendant's camera excluded from the evidence, since the camera was tampered with prior to a warrant being secured for the contents inside defendant's truck.

f.    Failing to have an evidentiary hearing to have the weapon excluded from the evidence since it was tampered with by Officer Jerry Powell.

g.    Trial counsel was ineffective for not being prepared for trial, by citing the wrong cases on point for a given proposition.

h.    Failing to object to prosecutor's highly inflammatory and prejudicial argument that the jury could infer malice because two shots were fired instead of one. The prosecutor said, "Ladies and gentlemen, I submit, this is malice. Two shots, not one, two shots to the back of the head."

i.    Failing to raise the <u>King</u>[10] defense after the jury came back from the deliberations, and asked the trial judge to re-instruct or repeat the instructions on murder and manslaughter.

j.    Failing to claim immunity under the Protection of Persons and Property Act as a pretrial motion instead of claiming it as a jury instruction.

k.    Failing to claim lack of jurisdiction by Spartanburg Superior Court as a pretrial motion instead of a directed verdict at the close of trial.

l.    Failing to request the court or produce expert witnesses for the defense.

m.    Failing to clearly explain to the jury on opening statements from the start that this was a self-defense case.

n.    Failing to object to prosecutor's statements that "defendant would not stop."

o.    Failing to disclose important <u>Brady</u>[11] discovery material to defendant until well after trial.

p.    Failing to request complete charge on Article 6 instead of only § 16-11-

---

[10]445 S.E.2d 254 (S.C. 1930)(instructing a jury to resolve any reasonable doubt as to whether the defendant was guilty of a greater or lesser offense in favor of the lesser offence).

[11]*Brady v. Maryland*, 373 U.S. 83 (1963).

        450(a).

q.     Failure to argue why the second shot was necessary in order for the court to instruct the charge requested.

r.     Failing to cite State v. Hendrix in a timely manner for the continuing to shoot proposition.

s.     Failing to argue the lack of fingerprints from the steering wheel as exculpatory evidence since other fingerprint evidence was presented.

t.     Failing to request jury instruction that defendant had a right to judge the conduct of the deceased more harshly then otherwise because of his intoxication.

u.     Failing to request instruction to the jury that victim's violent behavior was an unreasonable reaction to defendant having passed his road.

v.     Failing to request jury instruction that the standard for evaluating whether a defendant accused of murder had reasonable belief that deadly force was necessary to prevent great bodily harm to himself, as element of self-defense is objective rather than subjective.

w.     Failing to request jury instruction that the jury could consider the first attack by the victim on the defendant after passing his road when weighing self-defense on the second attack by trying the run the vehicle off the road.

2.     Ineffective Assistance of Appellate Counsel

a.     Appellate counsel Robert M. Dudek was ineffective in failing to claim issue of the directed verdict on self-defense.

b.     Appellate counsel Robert M. Dudek was ineffective in failing to claim the issue on the directed verdict on venue.

c.     Appellate counsel Robert M. Dudek was ineffective in failing to raise the issue of State v. Curry[12] to the Appellate courts.

d.     Appellate counsel Robert M. Dudek was ineffective in skipping a crucial step in the appellate process.

e.     Appellate counsel Robert M. Dudek was ineffective in failing to raise the issue that evidence was insufficient that the defendant acted with malice.

f.     Appellate counsel Robert M. Dudek was ineffective in failing to be present at the most critical part of the appeal; oral argument.

g.     Appellate counsel Robert M. Dudek was ineffective in failing to cite State v. Day[13] along with Fuller for the trial judge's refusal to give the requested charge to the jury.

h.     Appellate counsel Robert M. Dudek was ineffective in failing to raise State

---

[12]752 S.E.2d 263 (S.C. 2013)(discussing applicability of S.C. Code Ann. § 15-11-440 and common law elements of self defense).

[13]535 S.E.2d 431 (S.C. 2000)(concluding failure to charge on the specific elements of self-defense that applied to defendant's theory constituted reversible error).

v. Belcher[14] to the Court of Appeals for the prosecutor's charge to the jury that they could infer malice because two shots were fired instead of one.

3.    Subject Matter Jurisdiction
a.    Subject Matter Jurisdiction lacked by Spartanburg Superior Court to try indictments 2008-GS-42-5308 and 2008-GS-42-5308(A).

4.    Prosecutorial Misconduct and Malicious Prosecution
a.    Ass. Att. Gen. Donald J. Zelenka lied on his brief to the Appellate Courts about the evidence and facts of the case.
b.    Prosecutor Susan Reese lied to the jury about evidence and facts of the case.

5.    Abuse of Discretion by Trial Court
a.    Trial court violated Due Process by refusing to give defendant a Preliminary Hearing as timely requested.
b.    Trial court abused its discretion by refusing to direct a verdict on self-defense since defendant proved self-defense as a matter of law.
c.    Trial court abused its discretion by refusing to direct a verdict on venue since the evidence proved the incident occurred before Wal-Mart in Greer, which is located in Greenville County.
d.    Trial court abused its discretion by refusing to acknowledge State v. Hendrix for the continuing to shoot proposition.
e.    Trial court abused its discretion by failing to protect defendant's Constitutional Rights and Due Process of Law.

6.    Abuse of Discretion by Appellate and Supreme Court
a.    Appellate court abused its discretion by refusing to grant the continuing to shoot proposition since it went to the heart of appellant's case, and because of prosecutor's highly prejudicial closing arguments.
b.    Supreme court abused its discretion by citing law against Marin that contradicts itself with other law.
c.    Supreme court abused its discretion by citing law against appellant that was enacted after appellant's case entered the appellate courts. (4 years after)
d.    Supreme and Appellate court abused its discretion by not giving Marin the same equivalence as Belcher for prosecutor's charge to the jury, that they could infer malice from two shots.  The prosecutor said to the jury: "Ladies and gentlemen, I submit this is malice!  Not one, two shots!"

---

[14]685 S.E.2d 802 (S.C. 2009)(holding a charge that malice may be inferred from the use of a deadly weapon is no longer good law where evidence is presented that would reduce, mitigate, excuse, or justify the killing), *overruled by State v. Burdette*, 832 S.E.2d 575 (S.C. 2019)("[R]egardless of the evidence presented at trial, a trial court shall not instruct the jury that it may infer the existence of malice when the deed was done with a deadly weapon.").

*See* ECF No. 23-3 at 145-51.[15]

A PCR hearing was held on February 1, 2018 before the Honorable Grace Gilchrist Knie. ECF No. 23-3 at 177 to ECF No. 23-4 at 144. Petitioner was represented by PCR counsel, James H. Price, III, Esquire. Valerie Giovanoli, Esquire, Assistant Attorney General, appeared on behalf of the State. Petitioner called to the stand Dale Arterburn, a detective with the Greer City Police Department, who testified he had located some fresh tire marks and debris on the route Petitioner allegedly had taken the night of the incident. ECF No. 23-3 at 192-206. Petitioner also called Donald Girndt, a forensic consultant who testified Petitioner's trial testimony was consistent with what Girndt saw at the crime scene. *Id.* at 206-18. Petitioner testified at length. *Id.* at 219-53; 23-4 at 1-72. The State called trial counsel to testify via telephone from Oklahoma with respect to Petitioner's allegations of ineffective assistance of counsel. Russell Ghent was called by the State to rebut Petitioner's claims of prosecutorial misconduct.

A new issue was discussed at the PCR hearing. Petitioner contended trial counsel "was ineffective in failing to, to argue why fingerprints were not taken of the steering wheel since [Tabares's] grabbing the steering wheel running the, the vehicle off the [road] was – went to the heart of the case, and that would of been exculpatory evidence." ECF No. 23-4 at 9. Petitioner also asserted the State suppressed evidence of Tabares's DNA on the steering wheel cover. *Id.* at 32. Petitioner produced a South Carolina Law Enforcement Division (SLED) Laboratory Forensic Services Request that listed, among other things, the steering wheel cover to be tested. *Id.* at 168-70. PCR counsel informed the court:

---

[15]A complete recitation of Petitioner's various amendments is set forth in the PCR judge's order filed June 5, 2018. ECF No. 23-6 at 11-14.

Now, I'm representing to the Court that same thing I told Ms. Giovanoli [for the State]. I did not catch this particular point. This was filed in December, done by my client, and I hurriedly filed it to get ready. When – after talking to Mr. Marin last week, I noticed this as an issue. So, I got in touch with SLED and Ms. Giovanoli, and we got – there was another letter sent to Spartanburg County saying that the samples submitted did not comply with [SLED's] test requirements.

Now, as of today, I have requested an email from SLED just letting me know did they do DNA or did they not. I wanted to put this thing to bed because this is a serious allegation against Ms. Reese. It's a serious claim by him.

As of today, I have not gotten a response from SLED. So, that's where we are. We've got a letter saying the samples did not comply.

*Id.* at 33-34.

According to Petitioner,

Well, if the testing was done, and it was not presented, that would be a suppression violation. If testing was not done and it was rejected, that is a *Brady* violation because I've never heard – I've never seen that letter. I've never – my trial counsel never mentioned anything about that, and she just said they just recently sent that letter.

*Id.* at 38.

On motion of PCR counsel, the PCR judge issued an order of discovery on February 7, 2010, directing SLED to either send the parties copies of all DNA/blood test results performed on Petitioner's steering wheel cover, or to affirmatively state in writing no DNA/blood testing was done. ECF No. 23-3 at 174-75. SLED verified it had not done any testing on the steering wheel because the requirements for routine analysis had not been met by Spartanburg County. *Id.* at 30.

On June 5, 2018, the PCR judge issued an order denying and dismissing Petitioner's PCR application, as amended, with prejudice. ECF No. 23-6 at 9-36. The PCR judge denied Petitioner's claims of ineffective assistance of counsel and prosecutorial misconduct, and summarily dismissed the remaining claims as improper for PCR relief, as they could have been raised at trial and on direct

appeal. *Id.* at 34-35. Given the many allegations submitted by Petitioner to the PCR judge, this court will address *infra* the PCR judge's conclusions only with respect to the grounds for relief Petitioner raises in his § 2254 petition.

Ashley A. McMahan, Esquire, filed a *Johnson*[16] petition for writ of certiorari on behalf of Petitioner on January 3, 2020. ECF No. 23-7. McMahan raised the following issue:

> Did the PCR court err in finding trial counsel was effective when counsel failed to call an expert witness regarding self-defense?

*Id.* at 3.

On February 7, 2020, Petitioner filed a lengthy response to the *Johnson* petition in which he presented the following questions for review:

> [I]     Did the PCR court err in finding the Prosecution did not suppress exculpatory evidence?
>
> [II]    Did the PCR court err in finding trial counsel was effective when counsel failed to object to prosecutor's highly prejudicial closing argument that Petitioner's firing of two shots was evidence of malice?
>
> [III]   Did the PCR court err in finding trial counsel was effective when counsel failed to object to prosecutor's highly prejudicial closing argument that Petitioner would not stop the vehicle while being attacked by the decedent. Negating his "No Duty to Retreat"?
>
> [IV]    Did the PCR court err in finding appellate counsel was effective when counsel failed to raise the directed verdict on self-defense issue?
>
> [V]     Did the PCR court err in finding Spartanburg County Prosecutor acting the role of an Asst. Attorney General did not commit prosecutorial misconduct by misstating facts and evidence in this case to the Court of Appeals and the Supreme Court?

---

[16]*Johnson v. State*, 364 S.E.2d 201 (S.C. 1998) (reiterating compliance with procedural requirements set forth in *Anders v. California*, 386 U.S. 738 (1967), that appellate counsel brief anything in the record that might arguably support the appeal).

27

ECF No. 23-8 at 4.

The South Carolina Court of Appeals issued an order denying the petition for writ of certiorari on November 2, 2021.  ECF No. 23-10.  Remittitur was issued on November 18, 2021.

## II.  LEGAL STANDARDS

A.    Habeas Review

Title 28, United States Code, Section 2254 provides, in relevant part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

   (A) the applicant has exhausted the remedies available in the courts of State; or

   (B)(i) there is an absence of available State corrective process; or

      (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The limited scope of federal review of a state petitioner's habeas claims is grounded in fundamental notions of state sovereignty. *Richardson v. Branker*, 558 F.3d 128, 138 (4th Cir. 2012) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). When a federal court adjudicates a habeas corpus petition brought by a state prisoner, that adjudication constitutes an intrusion on state sovereignty. *Id.* (citing *Harrington*, 562 U.S. at 103). A federal court's power to issue a writ is limited to exceptional circumstances, thereby helping to ensure that "'state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.'" *Id.* (citing *Harrington*, 562 U.S. at 103). The restrictive standard of review "'further[s] the principles of comity, finality, and federalism.'" *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 364 (2000)). "'The pivotal question is whether the state court's application of the [applicable federal legal] standard was unreasonable.'" *Id.* (quoting *Harrington*, 562 U.S. at 103). So long as fairminded jurists could disagree on the correctness of a state court's decision, a state court's adjudication that a habeas claim fails on its merits cannot be overturned by a federal court. *Id.* (citing *Harrington*, 562 U.S. at 102).

B.    <u>Prosecutorial Misconduct</u>

Prosecutorial misconduct warrants vacating a sentence only when the defendant demonstrates

both (1) the prosecutor's conduct was improper, and (2) the misconduct prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *United States v. Horton*, 72 F. App'x 949, 950 (4th Cir. 2003) (citing *United States v. Golding*, 168 F.3d 700, 702 (4th Cir. 1999)). When considering cases of prosecutorial failure to disclose evidence favorable to the accused, the evidence must be material. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Under *Brady*, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 88. To establish a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the State suppressed the evidence, "either willfully or inadvertently"; and (3) "prejudice . . . ensued." *Skinner v. Switzer*, 562 U.S. 521, 536 (2011)(quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

C.     Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily must satisfy both parts of the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner first must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. In making this determination, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;

30

that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). However, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Id.* at 691-92 (citing *United States v. Morrison*, 449 U.S. 361, 364–65 (1981)). "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692.

## III.  DISCUSSION

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Mary Gordon Baker for pretrial handling. The State filed a motion for summary judgment on July 15, 2022. ECF No. 24. By order filed July 19, 2022 pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Petitioner was advised of the summary judgment procedures and the possible consequences if he failed to respond adequately. ECF No. 25. Petitioner filed a response in opposition on August 22, 2022, ECF No. 30, to which the State filed a reply on September 7, 2022, ECF No. 35. The Magistrate Judge filed a Report and Recommendation on October 7, 2022. ECF No. 38. Petitioner filed objections to the Report and Recommendation on December 16, 2022. ECF No. 46. The State filed a reply on December 30, 2022. ECF No. 47.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court.

31

*Mathews v. Weber*, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1). This court may also receive further evidence or recommit the matter to the Magistrate Judge with instructions. *Id.*

Petitioner asserts the following issues and supporting facts in his § 2254 petition. There is no dispute that Petitioner's § 2254 petition is timely and that Grounds One through Four have been exhausted in the state courts. The State asserts, however, that Ground Five is procedurally defaulted.

A.    GROUND ONE:  Suppression of Exculpatory Evidence (Violation of Due Process of Law). During the PCR hearing Petitioner's counsel presented to the court, chain of custody forms sending a steering wheel cover to SLED. The forms requested DNA analysis of the cover to be compared with the victim and Petitioner.

At the request of Petitioner's counsel, the PCR court issued an Order of Discovery requiring SLED to provide written confirmation as to whether any DNA analysis of the steering wheel cover (SLED Lab No.: L08-11693) was ever performed.

Pursuant to the Order, SLED provided a letter to the effect that the matter was sent back to Spartanburg County Sheriff's Office's Investigator Demetric Glen.

In the aforementioned letter SLED informed Investigator Demetric Glen that their protocol was not followed, and requested that a blood sample, or bucal swab be submitted for comparison purposes: "Please submit a bucal swab (preferred) or liquid blood from the subject(s) for comparison purposes."

If the requested DNA standards are not submitted within three months, the evidence will be returned to the submitting agency without analysis." Which is exactly what occurred. No further action was performed. The State neglected to, or failed to submit the requested samples for DNA analysis on SLED Lab No.: L08-11693 (steering wheel cover).

ECF Nos. 1 at 5; 1-2 at 5-11.

* * *

The PCR judge recited in her order dismissing the PCR application:

Applicant also alleged prosecutorial misconduct, in that the State failed to disclose

32

> DNA testing performed on the Applicant's steering wheel cover. This Court granted Applicant discovery to resolve whether such DNA testing had been done. SLED thereafter provided all documentation surrounding the testing of a sample collected from the steering wheel cover which revealed no testing had ever been done, because the requirements for routine analysis had not been met. Therefore, Applicant has failed to prove this allegation.

ECF No. 23-6 at 30.

The State argues on summary judgment it provided trial counsel notice the steering wheel cover had been submitted for DNA testing, and the State had no obligation to turn over evidence that did not actually exist but could have been requested. The State also submits there was no guarantee the steering wheel cover would have produced any results useful to Petitioner, recounting trial testimony that the steering wheel had a textured cover, and that fingerprints are more likely to be lifted from slick or shiny surfaces. The State further asserts there was no prejudice because no real dispute existed over whether Tabares had grabbed the steering wheel during the struggle. ECF No. 38 at 12-14.

The Magistrate Judge determined the PCR judge's conclusion was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the PCR proceeding. ECF No. 38 at 11 (quoting 28 U.S.C. § 2254(d)). However, the Magistrate Judge also observed the issue Petitioner raises in his § 2254 petition is slightly different from the issue raised before the PCR judge. The Magistrate Judge noted Petitioner now asserts prosecutorial misconduct because the State failed to disclose *no* DNA testing had been performed on the steering wheel cover. Petitioner submits in his § 2254 petition that, as a result, he lost the opportunity to request the trial judge order SLED to perform DNA testing. Petitioner contends the testing would have provided him

confirmation the victim grabbed the steering wheel, thereby placing Petitioner in danger and in fear for his life and justifying his shooting Tabares in self-defense. ECF No. 1-2 at 9-10.

The Magistrate Judge found the State's arguments to be convincing. The Magistrate Judge further determined no *Brady* violation occurred because the State did not conceal the fact the steering wheel cover was submitted for testing, but testing did not take place. ECF No. 38 at 13 (quoting *State v. Sauvain*, 958 N.W.2d 237 (Iowa Ct. App. 2021)). In other words, trial counsel would have been aware no testing took place because no results were reported. Further, the Magistrate Judge held that, to the extent Petitioner attempts to raise a more general due process violation based on the State's failure to test the steering wheel cover, his attempt fails because he made no showing of bad faith. *Id.* at 14 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)(holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law" )). The Magistrate Judge recommended summary judgment be granted as to Ground One. ECF No. 23 at 12.

In his objections, Petitioner asserts the Magistrate Judge erred in finding trial counsel would have known no DNA testing was done on the steering wheel. Petitioner asserts trial counsel complained before trial the State was not complying with discovery requests. According to Petitioner, had the State complied with discovery, then trial counsel would have known no testing had been performed on the steering wheel cover. Petitioner cites to *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), for the proposition that "a *Brady* claim may arise where the Government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence[.]" (quoting *United States v. Agurs*, 427 U.S. 97, 104-07 (1976)). As the *Kyles* Court subsequently recited, however, the *Agurs* test was modified by *United States v. Bagley*, 473 U.S. 667, 682 (1985), which held

"favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  The Court explained that

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence in the outcome of the trial.

*Kyles*, 514 U.S. at 434.

Petitioner also contends the State's "highly misleading" closing argument repudiated the existence of a struggle.  Specifically, Petitioner identifies the following statements made by the State at the end of trial:

> "Later [Jimenez] says the man was trying to wreck the vehicle grabbing the steering wheel.  The defendant is calm and quiet sitting on the median.  He's not hysterical; he's not screaming."  [ECF No. 23-2 at 34.]

And again:

> "So when you shoot somebody in the head and they stop struggling with you, if that's what they're doing."  [ECF No. 23-2 at 41.][17]

And again:

> "Ask, ladies and gentlemen, if that's reasonable with the defendant's story.  The defendant says, oh, my gosh, we were struggling, he had me, I was trying to shove him off, back and forth."  [ECF No. 23-2 at 40.]

And again:

> "Everything he says is true?"  [ECF No. 23-2 at 49.]

---

[17] The full quote is:  "So when you shoot somebody in he head and they stop struggling with you, if that's what they're doing, you don't have – you won't shoot them a second time unless you pull that trigger a second time."

ECF No. 46 at 3.

The court disagrees.  A review of the transcript demonstrates the State did not argue there was no struggle, but that Petitioner's response to the struggle was unreasonable under the circumstances.  In addition to the trial transcript quoted *supra*, the State asserted:

> [The victim] tries to grab the steering wheel, ladies and gentlemen.  But make no mistake.  He's the one that was trying to defend himself.  . . . He grabs the steering wheel.  He forces the car off the road because there's damage, there's debris.  There is damage.  And that's when I submit to you, ladies and gentlemen, he was shot twice in the back of the head, because that makes no sense.

ECF No. 23-2 at 51.

Finally, Petitioner objects to the Magistrate Judge's citation of *Youngblood* in  contending *Youngblood* is contrary to *Kyles*' warning that "the suppression by the prosecution of evidence favorable to an excused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  514 U.S. at 432 (quoting *Brady*, 373 U.S. at 87).  *Youngblood* and *Brady* are distinguishable.  In *Youngblood*, the police collected the clothing of a rape victim but neglected to refrigerate the evidence.  Later, a criminologist attempted to obtain blood group substances from stains on the clothing after testing of a swab from a rape kit was unsuccessful.  Testing the clothing also was unsuccessful, presumably because the evidence had degraded from lack of refrigeration.  The defendant was found guilty.  On appeal, the *Youngblood* Court found the state had complied with *Brady* by disclosing relevant police reports containing information about the existence of the swab and the clothing; disclosing the victim's examination at the hospital, disclosing the laboratory reports and notes prepared by the criminologist, and giving Youngblood's expert witness access to the evidence.  The Court held the good or bad faith of state officers was irrelevant "when the State fails to disclose to the defendant

material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said that it could have been subject to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.

This court finds any exculpatory value that could have been gleaned from testing the steering wheel cover to be speculative. Had Tabares's DNA or fingerprints been identified, their presence would have supported both the State's and Petitioner's versions of events because, as the Magistrate Judge stated, there was no real dispute Tabares had grabbed the steering wheel. On the other hand, had the victim's DNA or fingerprints not been found on the steering wheel cover, the government could have used the absence of this evidence to attack Petitioner's credibility. The court also discerns no prejudice because Petitioner took the stand and testified regarding his account of the killing. The jury was not persuaded. Ground One is without merit.

B.    GROUND TWO:[18]  Ineffective Assistance of Trial Counsel. Trial counsel Tanya R. Jones was ineffective when she failed to object to prosecutor's highly prejudicial closing argument that the Petitioner would not stop the vehicle while being attacked by the victim, thereby negating his no duty to retreat.

ECF Nos. 1 at 8; 1-2 at 17-19.

* * *

According to the PCR judge:

Applicant alleged Counsel should have objected when the prosecutor stated in closing that Applicant "would not stop." (Tr. p. 349). However, Applicant has failed

---

[18] Petitioner informs the court he inadvertently placed Ground Two before Ground Three and that the issues should be decided in reverse order to fit more clearly into the facts. Petitioner asserts his objections in his referred sequence, renaming Ground Three as Ground Two and Ground Two as Ground Three. ECF No. 46 at 5-21.

to present any evidence as to why this comment was objectionable. The comment was in reference to evidence presented at trial. Jimenez's excited utterances were admitted. Jimenez said Applicant was supposed to take the victim home, passed the victim's home, the victim got upset and tried to get Applicant to stop the car, and Applicant "just wouldn't stop." (Tr. p. 122). Applicant himself testified he never stopped even after the victim allegedly kept trying to reach for the wheel and Applicant pushed him back. (Tr. p. 303). Therefore, the prosecutor's comment was not objectionable and Counsel was not deficient.

ECF No. 23-6 at 28-29.

The State argues in its summary judgment motion the PCR judge's conclusions reasonably applied *Strickland* based on the record. The State also asserts the arguments made by the solicitor went to the reasonableness of Petitioner's actions when he "knowingly and willingly passed the victim's home while continuing to drive further and further from the victim's home. Instead of stopping his car or turning around when the victim objected, Petitioner drove on for miles, and Petitioner eventually pulled a loaded firearm from his glove box and shot the victim in the back of the head 2 times." ECF No. 23 at 18-19. The State submits any objection to this argument would have been overruled; therefore, Petitioner cannot show deficient performance.

Finally, the State contends the solicitor's comments also went to whether Petitioner was at fault in bring on the difficulty, which would contradict his claim of self-defense. The State recounts Petitioner did not take Tabares home despite his protestations, would not stop, would not turn around, and traveled farther away from Tabares's home. Consequently, according to the State, the complained-of closing argument was proper.

The Magistrate Judge observed there was evidence in the record Petitioner would not stop the car after he passed the turn to the victim's house, such that the solicitor's statements did not misconstrue the evidence. The Magistrate Judge also observed the trial judge cautioned the jury it

was to apply the law he provided; the trial judge correctly instructed the jury Petitioner had no duty to retreat; and the State's closing argument did not contradict the trial judge's charge. The Magistrate Judge concluded Petitioner failed to show either unreasonable factual findings or an unreasonable application of federal law. The Magistrate Judge therefore recommended the State's motion for summary judgment be granted as to this Ground.

In objecting to the Magistrate Judge's conclusions, Petitioner reiterates his trial testimony and submits that, because he acted in self-defense, trial counsel was ineffective for failing to object to the solicitor's closing wherein she stated "twenty six (26) times that Petitioner did not stop (retreat)." *Id.* at 10. The court disagrees. "Under the Castle Doctrine, '[o]ne attacked, without fault on his part, on his own premises, has the right, in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense." *State v. Glenn*, 838 S.E.2d 491, 495-96 (S.C. 2019) (quoting *State v. Jones*, 786 S.E.2d 132, 136 (2016)). The State's theory was that Petitioner was at fault, not Tabares. The Castle Doctrine does not shield a person who is the aggressor on his own premises.

It must be assumed the jury followed the instructions given by the trial judge and took into account the trial judge's charges regarding the Castle Doctrine and the elements of self-defense. *See United States v. Benson*, 957 F.3d 218, 230 (4th Cir. 2020). The factual dispute of whether Petitioner acted in self-defense was a jury issue decided adversely to Petitioner. Absent a finding of self-defense, the Castle Doctrine became immaterial. Petitioner's objection is without merit.

C.     GROUND THREE:[19]  Ineffective Assistance of Trial Counsel. During the State's closing

---

[19] Petitioner's objections to the malice issue (denominated as Ground Three) commence in his discussion of the self-defense issue (denominated as Ground Two). *See* ECF No. 46 at 10. The court will address the objections under the correct caption.

argument, the State's only argument that Petitioner was guilty of malice murder was the fact that Petitioner fired two shots instead of one.

Absent an objection by trial counsel, and absent an ex mero motu curative instruction by the trial judge, the jury took this submission of wrongful law by the prosecutor into deliberations with the assertion that Petitioner was guilty of malice murder because two shots were fired instead of one.

ECF Nos. 1 at 7, 1-2 at 12-16.

At the PCR hearing, Petitioner also claimed he should have received the same treatment as

the defendant did in *Belcher*, stating:

the [*Belcher* trial] Court argued that malice was inferred by the use of a [deadly] weapon. In my case, malice was inferred by the use – by two shots being fired instead of one. I feel that I should of gotten the same treatment as Belcher did that the – for the Supreme Court. [Trial counsel] should of argued that, that two shots were not – you can not infer malice by two shots being fired. . . . Just as you can not infer malice by the use of a [deadly] weapon.

ECF No. 23-4 at 17.

* * *

The PCR judge held:

Applicant also complains that Counsel did not object to the prosecutor's argument that the two shots was evidence of malice. This issue was also used to support Applicant in his arguments on appeal. However, this Court finds the argument was proper and not objectionable. Counsel did not find the argument objectionable, but, rather, in response to it, she argued for the "continue to shoot" charge. This Court finds her performance in this regard was reasonable and sound. Likewise, this Court finds Counsel's closing arguments were also reasonable, despite Applicant's allegation Counsel should have argued why the second shot was "necessary." Not only does this Court find the evidence did not support such an argument,[3] but such an argument was not likely to change the outcome of the trial.

[3]At trial, Applicant testified he shot twice, "real fast—boom, boom" (Tr. p. 313-314) within seconds. Therefore, how could he have known if the second shot was "necessary."

Lastly, this Court notes that the law from *Hendrix* states that "when a person is

justified in firing the first shot, he is justified in continuing to shoot until it is apparent that the danger to his life and body has ceased." *Hendrix*, [244 S.E.2d 505,] 507 [(S.C. 1978)]. The more relevant issue for the jury to determine in this case, was if Applicant was even justified in shooting the heavily intoxicated victim in the back of the head two times after the victim has, on more than one occasion, pleaded for Applicant to stop or turn around after Applicant had passed his home at 3:00 AM and continued to drive farther and farther from the victim's home. The victim had even "attacked" Applicant from the backseat prior to the fatal attack and Applicant was able to push him off and into the backseat. At no point in time between that attack and the 10 miles Applicant continued to drive did he consider pulling over and kicking Applicant out of the car. Nor did Applicant consider simply slowing down and kicking Applicant out of his car during the second "attack," in which Applicant alleged the victim was trying to "kill them all" by running the car off the road. Instead, Applicant chose to reach over to his glove compartment,[4] pull out a pouch containing a gun, put the pouch between his legs, unzip the pouch, pull out the gun, then press the gun firmly against the back of the victim's head/neck and fire two rapid shots, all while still driving the car while passenger Jimenez sat by idly offering no assistance in subduing the alleged "attacker" that was trying to "kill them all." In this Court's reading of the record, the most relevant issue was the credibility of Applicant's self-defense claim, rather than whether there was malice because he fired two shots. Counsel was not deficient. Had Counsel done any of the things Applicant insists she should have, the facts would not have changed, and therefore the outcome would not have changed.

> [4]The evidence seems to indicate that Applicant would have had to reach to his glove compartment for the secured gun while Applicant was not "attacking" him, but, rather, while he was subdued in the backseat.

ECF No. 23-6 at 22-23.

In its summary judgment motion, the State submits the PCR judge's findings are consistent with the record and not contrary to or an unreasonable application of federal law. The State also argues Petitioner mistakes what occurred in *Belcher*.[20] The State discusses *Belcher* and *Burdette*, which modified *Belcher*, pointing out both cases analyze the impropriety of charging a jury one can infer malice from the use of a deadly weapon. The South Carolina Supreme Court declared in

[20]Petitioner raises *Belcher* with respect to ineffective assistance of appellate counsel and appellate court abuse of discretion arguments. *See supra* n. 14.

*Burdette*:

> We decide this issue solely under the common law; pursuant to our policy-making role under the common law, we hold, regardless of the evidence presented at trial, a trial court shall not instruct the jury that it may infer the existence of malice when the deed was done with a deadly weapon. *Of course, whether the deed was done with a deadly weapon or not, the State and the defendant are free to argue the existence or nonexistence of malice based on the evidence in the record. For example, if evidence is introduced that the deed was done with a deadly weapon, the State is free to argue to the jury that it should infer the existence of malice based on that fact and any other facts that would naturally and logically allow a jury to conclude the defendant acted with malice aforethought.* Similarly, if the deed was not done with a deadly weapon, a defendant is free to argue the absence of malice based on that fact and any other facts that would naturally and logically allow a jury to conclude the State failed to prove beyond a reasonable doubt that the defendant acted without malice aforethought. "It is axiomatic that some matters appropriate for jury argument are not proper for charging. 'Do jurors need the court's permission to infer something? The answer is, of course not.'" *Belcher*, 385 S.C. at 612 n.9, 685 S.E.2d at 810 n.9 (quoting Bruce A. Antkowiak, *The Art of Malice*, 60 Rutgers L. Rev. 435, 476 (2008)).

832 S.E.2d at 582 (emphasis added).

As the State discusses, neither *Belcher* nor *Burdette* prohibited the parties from arguing to the jury the existence or nonexistence of malice based on the record. A jury instruction on the same topic, however, constitutes an improper charge on the facts, rather than on the law.

The Magistrate Judge noted the PCR judge's rejection of Petitioner's claim was based partly on credibility findings, which were entitled to deference. ECF No. 38 at 17 (citing *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear.")). The Magistrate Judge also determined Petitioner failed to demonstrate the PCR judge erred in affirming trial counsel's decision to request the "the continue to shoot" instruction rather than objecting to the State's evidence of malice argument during trial.

Additionally, the Magistrate Judge rejected Petitioner's claim *Hendrix* supports his argument that malice cannot be inferred from the fact the victim was shot twice instead of once. In *Hendrix*, the defendant, claiming self-defense, shot the victim once, paused, and then shot the victim four times in rapid succession. The supreme court found the defendant had established self-defense as a matter of law. The supreme court addressed the prosecutor's complaint in terms of excessive force, but determined the defendant was entitled to "continue to shoot" because the decedent did not fall until the final shot. The Magistrate Judge found *Hendrix* to be distinguishable, observing that, in this case, both the trial judge and PCR judge determined an issue existed as to whether Petitioner was justified in firing the first shot. The Magistrate Judge recommended summary judgment be granted as to this Ground.

Still relying on *Hendrix*, Petitioner states in his objections that, since he had no duty to retreat, he was entitled to act in self-defense, and since he was entitled to act in self-defense, trial counsel's performance was deficient for failing to object to the prosecutor's assertion the two shots to Tabares's head could constitute evidence of malice. ECF No. 46 at 10. The court disagrees. As with the solicitor's argument Petitioner "refused to stop," a factual dispute existed whether Petitioner acted in self-defense, and, if not, whether he acted with malice. The solicitor's position was not contrary to *Hendrix*; rather, the solicitor's position was the facts did not support a finding of self-defense. The solicitor did not misstate the law, and trial counsel was not ineffective for failing to object to the solicitor's argument in this regard. By extension, the trial judge did not err in failing to issue a curative charge to correct the solicitor's statements.

As is apparent, many of Petitioner's complaints of error are based on a false premise: that he acted in self-defense. *See* ECF No. 46 at 14. The jury found otherwise. The appellate courts

affirmed the conviction and sentence. Petitioner contends the South Carolina Supreme Court erred in finding the failure to give the "continuing to shoot" charge did not mandate reversal; nevertheless the supreme court's decision is governing law and cannot be disregarded by this court.

Petitioner also contends the supreme court would not have held the "continuing to shoot" charge was appropriate had the court not believed self-defense existed in this case. ECF No. 46 at 18. Petitioner overstates the supreme court's ruling. Under *Douglas v. State*, 504 S.E.2d 304, 310 (S.C. 1998), a case cited by Petitioner, the correct rule is: "The law to be charged is determined from the evidence presented at trial." Here there was *evidence* Petitioner acted in self-defense, *e.g.*, his own testimony and the testimony of his expert witness. There also was *evidence* Petitioner did not act in self-defense, *e.g.*, Jimenez's excited utterances and the contact wounds on the victim's head. It was for the jury to decide whether it accepted or rejected the evidence and explanations offered by the witnesses and Petitioner. Petitioner's objections are without merit.

D.    GROUND FOUR: Ineffective Assistance of Appellate Counsel. Chief appellate defender was ineffective when he failed to raise the issue on the directed verdict on self-defense. Self defense was proven in this case as a matter of law and the Appellate Court could have ruled that trial court erred in not granting the Directed Verdict.

ECF Nos. 1 at 10, 1-2 at 20-21.

\* \* \*

The PCR judge recited:

Applicant alleged appellate counsel was ineffective for failing to raise various issues and case law on appeal. Applicant further alleged appellate counsel was ineffective for "skipping" oral argument.

Applicant has failed to meet his burden of proving either appellate counsel was deficient or that Applicant was prejudiced by such alleged deficiencies. Applicant proposed that appellate counsel should have briefed issues that are either without basis in any authority in South Carolina law, or were actually raised, or are clearly

44

> inferior to the issues which were raised. Applicant failed to present any evidence to convince this Court that the issues raised were not the most meritorious issues available on appeal. This is evidenced by the fact that the case was called to oral argument at the Court of Appeals, resulted in a published opinion from the Court of Appeals, the Supreme Court granted certiorari to review the case, the Supreme Court called the case for oral argument, and resulted in a published opinion from the Supreme Court. Further, this Court finds none of the case law Applicant insisted should have been used to be of any benefit to the arguments made on appeal.

ECF No. 23-6 at 32.

The State urges in its summary judgment motion the PCR judge's decision is fully supported by the record. The State recounts the PCR judge's determination Petitioner was not entitled to a directed verdict on lack of malice and self-defense and that the case should be submitted to the jury. The State observes the trial judge's obligation is to consider the existence of evidence, not the weight of the evidence. ECF No. 23 at 21 (citing *State v. Walker*, 562 S.E.2d 313, 315 (S.C. 2002)).

The Magistrate Judge notes South Carolina law constrained the trial court to deny the directed verdict motion if there was any direct or substantial circumstantial evidence Petitioner did not shoot the victim in self-defense. According to the Magistrate Judge, there are multiple reasons to doubt Petitioner's version of events and to doubt his contention he shot the victim in self-defense. The Magistrate Judge concluded Petitioner failed to meet his burden of showing the PCR judge made unreasonable factual findings or unreasonably applied federal law. Thus, the Magistrate Judge recommended summary judgment be granted as to Ground Four.

In his objections, Petitioner submits the directed verdict

was denied on the basis of these misstatements of law and misleading of facts demonstrate plain error in itself, thus prejudice:

(1) "two" shots: as excerpted above . . . this is a misstatement of law.
(2) "contact-wound shots": The victim was between Petitioner (the driver) and the steering wheel (in a confined space) and trying to wreck the vehicle.

(3) "to the back of the head: again, as explained above, the victim was facing away
from Petitioner, trying to wreck the vehicle. Nothing in this argument demonstrates
malice.

ECF No. 46 at 21.

As previously articulated, Petitioner continues to argue he acted in self-defense. This
position was rejected by the jury and the court has found no reason to conclude Petitioner was not
accorded a fair trial.

Petitioner also requests the court to apply "plain error" review to the two issues raised by
appellate counsel. The court declines to do so. Before applying for federal habeas relief, a petitioner
must first exhaust the remedies available in state court or demonstrate the absence or ineffectiveness
of such remedies. 28 U.S.C. § 2254(b)(1)(A). This requirement gives "state courts the first
opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and
sentencing[.]" *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). The "[e]xhaustion generally
requires that the essential legal theories and factual allegations advanced in federal court be the same
as those advanced at least once to the highest state court." *Pruett v. Thompson*, 771 F. Supp. 1428,
1436 (E.D. Va. 1991), *aff'd*, 996 F.2d 1560 (4th Cir. 1993) (citing cases). Petitioner raises this
argument for the first time on § 2254 habeas review. The argument would be procedurally defaulted
if presented in state court because South Carolina law prohibits successive petitions alleging grounds
that were available when a petitioner first filed. *See* S.C. Code Ann. § 17-27-90.[21] Further, South

---

[21] Section 17-27-90 provides: "All grounds for relief available to an applicant under this chapter must
be raised in his original, supplemental or amended application. Any ground finally adjudicated or
not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in
the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may
not be the basis for a subsequent application, unless the court finds a ground for relief asserted which
for sufficient reason was not asserted or was inadequately raised in the original, supplemental or
amended application."

Carolina appellate courts do not recognize the plain error rule. *See, e.g., State v. Sheppard*, 706 S.E.2d 16, 19 (S.C. 2011). As a result, Petitioner's new argument contained in Ground Four is simultaneously exhausted and procedurally barred from federal review. Petitioner's remaining objections are without merit.

E.     GROUND FIVE:  Prosecutorial Misconduct.  Prosecutor Ghent abused his discretion and committed prosecutorial misconduct by misstating and injecting disinformation into the State's brief to the Court of Appeals, and the Supreme Court in order to create bias, and prejudice against Petitioner, and to introduce the element of malice in order to obstruct Petitioner's claims on his appeal.

ECF No. 1-2 at 22 -27.

According to the PCR judge:

In his application, Applicant alleged prosecutorial misconduct and malicious prosecution.  However, prosecutorial misconduct is not typically an issue for post-conviction relief.  Rather, this allegation is a direct appeal issues that is procedurally barred by S.C. Code Ann. § 17-27-20(b).   Post-conviction relief is not a substitute for an appeal. *Simmons v. State*. 264 S.C. 417, 423, 215 S.E.2d 883, 885 (1974).  A post-conviction relief application cannot assert any issues that could have been raised at trial or on appeal. *Drayton v. Evatt*, 312 S.C. 4, 8, 430 S.E.2d 517, 520 (1993). Applicant could have raised these issues during trial and on appeal. The failure to do so has waived this allegation as grounds for relief.  Regardless, it is applicant's burden to prove actual prosecutorial misconduct. *Alabama v. Smith*, 490 U.S. 794 (1989).

To the extent Applicant raises these allegations as being newly discovered, and, therefore, could not raise the issues at trial or appeal, this Court finds the allegations without merit.  Applicant essentially claims that every State actor "lied" in every step of his criminal case – from the investigation through trial and even on appeal.  Applicant has set forth no credible evidence to support his allegations of prosecutorial misconduct, other than his self-serving testimony.  Furthermore, a reading of the record reveals neither Detective Arterburn, Assistant Solicitor Susan Reese, nor Assistant Solicitor Russell Ghent lied during any phase of Applicant's trial and appeal.  Detective Arterburn was consistent in the testimony he provided at both trial and during the PCR hearing regarding how he established the location of the shooting.  This Court finds nothing untruthful about either.  Applicant did not present any credible evidence to support his contention that evidence was "falsified." Additionally, both Reese's and Ghent's arguments to the jury in closing and in the

47

briefs on appeal were based on the evidence presented at trial and the reasonable inferences to be made therefrom.  Therefore, Applicant has failed to meet his burden to prove prosecutorial misconduct by a preponderance of the evidence.  This allegation is denied and dismissed with prejudice.

ECF No. 23-6 at 33-34.

The State argues the PCR judge's determination of this issue is entitled to deference, as well as being fairly supported by the record.  However, the State also asserts Ground Five is defaulted and the procedural bar should be applied. The Magistrate Judge also recommends the State's summary judgment motion be granted as to Ground Five.  ECF No. 38 at 28 (citing *Coleman v. Thompson*, 501 U.S. 722, 749 (1991) ("The [independent and adequate state ground] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.")).

Despite the procedural default, both the State and the Magistrate Judge address the merits of Petitioner's arguments.  Petitioner asserts Ghent attempted to prejudice the appellate courts against Petitioner by misstating the facts.  For example, Petitioner objects to Ghent's argument in the State's brief:

> Even assuming for argument the events were as Appellant claimed at trial, the Appellant was not "without fault" in bringing on the difficulty which ultimately led to a man's death There was simply no question that the State had negated the first element of self-defense in its case in chief through all of the circumstances proven: *see, State v. Santiago, 370 S.C. 153, 634 S.E. 2nd 23, 27 (Ct. App. 2006)(taking a loaded gun to the site of a prior confrontation with the victim, and where the fatal encounter occurred, repudiated a claim defendant was without fault in bringing on the confrontation)*[.] . . . In *State v. Slater*, 373 S.C. 66, 644 S.E. 2nd 50 (SC 2007), our Supreme Court held that the defendant was not entitled to a self-defense charge, having approached an altercation that calculated to bring on the difficulty that arose.

ECF No. 1-2 at 24 (quoting in part the State's brief on appeal, ECF No. 23-2 at 141).

Petitioner states he did not take a loaded weapon to the site of a prior confrontation, and he

did not approach an altercation that was already in progress with a loaded weapon by his side. It is true the facts of *Santiago* and *Slater* are different from the ones at issue in this case. The point the State was attempting to make was its contention Petitioner's conduct – under the State's version of the facts – showed Petitioner was at fault "in provoking or initiating circumstances leading to the final assault by ignoring the victim's protest to stop or turn around[.]" ECF No. 23-2 at 142.

The Magistrate Judge concludes Petitioner failed to demonstrate the PCR judge made unreasonable factual findings when concluding Ghent's statements were either based on the evidence or reasonable inferences made therefrom. The Magistrate Judge further discerned no prejudice resulted from the statements made on appeal, particularly because the supreme court did not adopt the State's recitation of the facts. The Magistrate Judge recommended summary judgment be granted as to Ground Five.

The court finds Petitioner's ground for relief is procedurally barred. Alternatively, Petitioner's ground for relief fails on the merits for the reasons recited by the Magistrate Judge.

## IV.  CONCLUSION

The court concurs in the Magistrate Judge's Report and Recommendation. The court concludes the PCR judge's rulings were not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. The State's motion for summary judgment (ECF No. 24) is **granted**. Petitioner's § 2254 petition (ECF No. 1) is denied and dismissed, with prejudice.

## V.  CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue absent "a substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001). The court concludes Petitioner has not made the requisite showing.

**IT IS SO ORDERED**.

/s/ Donald C. Coggins
Donald C. Coggins
United States District Judge

Spartanburg, South Carolina

September 6, 2023

50